## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**TOM SHULLAW,**

    **Plaintiff,**

    **v.**                           **Case No. 3:23-cv-13317-MCR-ZCB**

**GRANT MCMULLEN, et al.,**

    **Defendants.**

_____/

### <u>ORDER</u>

    This is a civil rights action raising Fourth Amendment claims of false arrest, unreasonable search and seizure, and excessive force under 42 U.S.C. § 1983. Defendants, Escambia County Sheriff's Deputies Jonathan Hill and Grant McMullen ("Deputies"), who were sued in their individual capacities, have filed a Joint Motion for Summary Judgment, raising qualified immunity. ECF No. 24. Plaintiff Tom Shullaw opposes. ECF Nos. 28 & 29.[1] For the following reasons, the Joint Motion for Summary Judgment is due to be denied.[2]

---

[1] ECF Nos. 28 and 29, and exhibits thereto, appear to be identical, duplicate entries. Only ECF No. 29 will be cited herein.

[2] For the limited purpose of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party"—here, Plaintiff. *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (quoting *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006)).

On the evening of April 11, 2020, around 10:20 pm, a dispatcher with Escambia County Sheriff's Office ("ECSO") received a request from a caller, David Smith, to conduct a welfare check on his child, C.S., an 8-year-old minor, at a residence on Chiquita Drive in Pensacola, Florida.[3]  At 10:23 pm, the Deputies were dispatched for the welfare check requested by Smith to the Chiquita Drive address, which turned out to be the Shullaw's home where Plaintiff, Tom Shullaw, lived with his wife, Barbara Shullaw (hereinafter "Barbara," to avoid confusion with her husband).[4]  As it turns out, Barbara is the grandmother of C.S., who is the child of Barbara's daughter and Smith.  When dispatched, the Deputies were informed that the welfare check related to an "open missing person case in [Missouri]."[5]  Both Deputies described a welfare check as "checking on" a person who may be in

---

[3] Smith did not make reference to a "kidnapping" in the course of his call to the Sheriff's Office.

[4] Defendants have also provided a recording of the original call to the Sheriff's Office; however, that call apparently was not played for the officers, who received instead the ECSO Call History Report ("CAD") notes and what dispatch stated over the radio. ECF No. 23-2 at 15:25–16:6; *see also* ECF No. 23-1 at 63:16–20, 23:17–20.  Accordingly, the Court focuses its recitation of the facts on those known to the Deputies based on the CAD notes and their testimony.

[5] The CAD also reflected that this was a "Priority 3" call.  Hill explained that the Priority rating translates to the anticipated danger of a situation, and indicated that Priority 1 would be most dangerous while Priority 4 would be least. ECF No. 23-1 at 62:5–21, 76:3–6.  The CAD did not mention a "kidnapping."

danger.[6]  Dispatch did not include in the call notes the names of the Shullaws or that this was their home.

The Shullaws were asleep in their bedroom, located in the back of the home, when McMullen and Hill arrived at the home at 10:32 pm.  Shullaw's stepdaughter (and aunt of C.S.), Elizabeth Sitler, was also at the Chiquita Drive home, in her own room toward the front of the house.  When McMullen and Hill arrived, they walked to the residence, which had a lighted front porch, and knocked on the front door.  Shullaw and Barbara have testified that they awoke to "loud banging" at the front door, and Shullaw retrieved his .380 Ruger handgun from the nightstand and approached the front door while Barbara initially stayed in bed.  Shullaw testified that he heard a banging noise three times before he reached the front door.  As Shullaw was walking down the hallway, he yelled out, "who's out there," but he did not hear a response.

Shullaw also chambered ammunition as he approached the front door, creating a "racking" noise that both McMullen and Hill heard from outside.[7]   For purposes

---

[6] ECF No. 23-1 at 44:21–45:2; ECF No. 23-2 at 40:15–18; *see also Ermini v. Scott*, 249 F. Supp. 3d 1253, 1266 (M.D. Fla. 2017) ("Florida, as many jurisdictions, 'expect[s] [police officers] to take those steps that are necessary to ensure the safety and welfare of the citizenry at large.'" (citation omitted) (second alteration in original)).

[7] McMullen and Hill contend that Hill announced that they were with the "Sheriff's Office" just before hearing this racking of the gun.  Shullaw, though, disputes this, testifying no one announced themselves.  ECF No. 23-7 at 48:23–49:6, 54:5–7.  The Parties agree for summary judgment purposes, though, that Shullaw did not hear McMullen and Hill announce themselves as

of summary judgment, it is undisputed that Shullaw did not know the Deputies were law enforcement officers before he racked his gun.  On hearing the noise, Hill said there was a gun, and the officers stepped back for cover.  When Shullaw made it to the front door, he first looked out through a peephole and did not see McMullen or Hill.  He then opened the door inward with his gun pointed at the ground in his left hand.  Hill and McMullen saw Shullaw open the door with the gun in his hand.  Likewise, with the door open, Shullaw first saw McMullen and Hill's firearms, before realizing they were law enforcement officers.  McMullen and Hill yelled commands at Shullaw to "put the gun down" while Shullaw stood in the home about four to five feet inside the door.  ECF No. 23-7 at 54:11–55:4.  It is undisputed that Shullaw did not lift the gun or otherwise threaten the officers with his gun.  With the door still open, Shullaw kneeled down, placed the gun on the tile floor, and slid it away from him.[8]  There is no question that Shullaw complied with the Deputies' commands by putting the gun down.

With the gun on the ground, the Deputies instructed Shullaw to then walk out of the house.  Shullaw testified that the front door was "open less than half way" at

---

law enforcement from the outside before he chambered a round in his weapon.  ECF No. 30 at 3–4.

[8] The Parties dispute whether Shullaw put the gun down immediately: the Deputies contend that the verbal command to put the gun down had to be given several times, while Shullaw testified that "as soon as I saw who they were, I started dropping down to put the gun on the floor, and that's when they started yelling, 'Put the gun down, put the gun down.'"  *Compare* ECF No. 23-7 at 54:10–16 *with* ECF No. 23-1 at 18:5–10 ("I think we had to tell him at least several times, like

the time the Deputies made their demands that he come outside. ECF No. 23-7 at

57:3–9. Shullaw complied by walking toward the door and away from the gun:

Shullaw testified that when he reached the door frame, he was about ten feet away

from the gun still on the floor in the home. At that point, "one deputy was saying

get on the ground" while the "other deputy kept saying walk outside." *Id.* at 58:9–

12. The Deputies also threatened to fatally shoot Shullaw. Shullaw lowered himself

to his knees "in the doorway," with his body facing sideways toward the garage. *Id.*

at 59:4–7, 60:8–12. According to Shullaw, McMullen, with his weapon re-holstered,

then ran from where he was located near a window outside the home toward Shullaw,

leaped into the air, and came down with his knees on Shullaw's back while Shullaw

was in the process of getting his hands to the ground.[9] Shullaw's chin bounced off

of the concrete of the front porch when McMullen landed on him. Shullaw testified

that when McMullen jumped on his back, Shullaw "[thought] we were still more in

the door frame" and "[didn't] think [McMullen] was in the house at the time." ECF

No. 23-7 at 62:16–21. But when asked which way his body went when McMullen

---

two or three times, Drop the gun, drop the gun, drop the gun.") *and* ECF No. 23-2 at 10:24–25
("he doesn't immediately comply with putting the handgun down"). As explained more fully
below, this dispute is immaterial, because the Parties agree the gun was on the ground away from
Shullaw's reach before he was physically restrained.

[9] This version of the facts is disputed in the Parties' testimony, but, again, for purposes of
resolving a motion for summary judgment, the facts are viewed in Shullaw's favor. Furthermore,
the Deputies represent that they "are presenting the facts regarding Shullaw's detention based on
Shullaw's testimony of the events" for purposes of summary judgment. ECF No. 24 at 10 n.4.

jumped on him, Shullaw answered: "Inside. It pushed me into the house." *See id.* at 62:10–15. Shullaw then explained that his "right arm and leg were outside" the house while his left arm and leg were inside, and his "body was on the small doorstep." *Id.* at 63:1–10. McMullen fell from Shullaw's back after landing. During this tussle, Shullaw testified that McMullen pulled him "off of that step" to be fully on the front porch, and then McMullen got back on Shullaw's back again. *Id.* at 63:10–17, 64:12–17. In this position, Shullaw was on the ground with his arms straight to his side, and McMullen's knees were at the center of Shullaw's back.

Shullaw testified that McMullen then twisted Shullaw's right arm upwards and behind him. This positioning caused Shullaw to experience "a lot of pain." ECF No. 23-7 at 65:5–11. Additionally, McMullen yelled demands at Shullaw, such as, "who's in the house? Where's the girl?"[10] Shullaw testified that he was able to say his wife and daughter were in the house before he was unable to speak due to the force of McMullen's pressure on his lungs, which interrupted his breathing. McMullen then also swung Shullaw's left arm around and handcuffed his left and right hands together behind his back. McMullen continued to question who was in the house and where the girl was after Shullaw was handcuffed (and attempted to

---

[10] Shullaw also testified that he thought McMullen said that Shullaw was under arrest. *See* ECF No. 23-7 at 68:6–17. There is no testimony from McMullen and Hill about whether they said to Shullaw that he was under arrest, but they denied placing him under arrest. ECF No. 23-2 at 55:17–20 & ECF No. 23-1 at 52:16–17.

answer), while also moving Shullaw's handcuffed arms higher off his back.  After that, "Hill came over and lowered his knees into the back of [Shullaw's] knees." ECF No. 23-7 at 27:3–7.  According to the Deputies' Offense Report, Hill was instructed by McMullen to holster his weapon after Shullaw was on the ground.

McMullen testified that Shullaw told the Deputies he had a preexisting injury to his upper extremities while being handcuffed (or at the conclusion of handcuffing), which Barbara also emphasized to the Deputies.  *See* ECF No. 23-2 at 11:12–16 ("During the handcuffing or right after it was finished, Mr. Shullaw did advise that his arm was hurting and that he had a preexisting injury."); ECF No. 23-1 at 19:3–14 (Barbara explained that Shullaw had a preexisting injury); ECF No. 23-13 at 1 (Barbara "then came to the door and advised that []Thomas Shullaw has a significant pre-existing elbow and back injury that would make the handcuffed position uncomfortable.").

Approximately three minutes elapsed between the time of the Deputies' arrival on the scene and Shullaw being handcuffed.  After Shullaw was detained and handcuffed, Barbara approached the Deputies from inside the home, trying to speak with them, and McMullen jumped off Shullaw to speak with her while Shullaw remained on the ground of the front porch.  At this point, Barbara testified that McMullen "stepped . . . from the front stoop into the house" to ask who Barbara was. ECF No. 23-8 at 29:9–17; *see also* ECF No. 23-7 at 69:10–13 (Shullaw testified that

he saw McMullen immediately walk through the front door when Barbara tried speaking with the officers).  It is materially undisputed that at some point during this conversation McMullen entered the home without consent.[11]  McMullen asserted at deposition that, even in the absence of consent from Barbara, there were exigent circumstances to enter the home to determine the presence or absence of the missing child.  *See* ECF No. 23-2 at 63:15–64:18; *but see* ECF No. 23-1 at 56:2–6 (Hill testifying, "[w]e didn't know if we had any exigent circumstances.").

Once McMullen conveyed the officers' concern about the missing minor, C.S., Barbara stated that she was the grandmother of the child, whose parents are David Smith and Barbara's daughter.  McMullen testified that in the course of the conversation between McMullen and Barbara, "it bec[ame] pretty apparent [to McMullen] that there[ was] not going to be a missing child at this address," so McMullen "instruct[ed] Deputy Hill to release Mr. Shullaw from handcuffs."  ECF No. 23-2 at 12:10–13.  Shullaw had remained in handcuffs for approximately five minutes total.  In order to help Shullaw up from the ground, Hill placed his hand underneath Shullaw's armpit.  According to Shullaw, this further aggravated his pain

---

[11] At best, the Deputies do not recall any consent from Barbara or anyone else.  McMullen testified that he could not "recall if [he and Barbara] [were] talking at the threshold of the house and [] walked in to speak with each other or if she allowed me in or not."  ECF No. 23-2 at 64:1–3; *see also id.* at 64:7–18 ("I am engaged in the conversation with Ms. Shullaw that she has initiated as we enter the house.  That's all I'm claiming.").  And the Deputies do not claim consent as a basis to enter the home in their briefing.  *See* ECF No. 30 at 7 ("McMullen and Hill have never asserted they had . . . consent to enter the residence.").

and caused him harm.  Shullaw testified that he had asked Hill "not to grab [his] right arm, because that's the one that was injured, and [Hill] did anyway."  ECF No. 23-7 at 27:17–19.

At some point while speaking with Barbara, McMullen picked up and secured Shullaw's handgun from the floor inside the home.[12]  In terms of timing, Shullaw testified that the loaded gun was still on the ground when he was unhandcuffed and standing.  After retrieving the gun from the ground, McMullen unloaded the ammunition and placed it on a shelf.  Around the same time that Shullaw was taken out of handcuffs, his stepdaughter Elizabeth also entered the front room where Barbara and McMullen were speaking while Shullaw and Hill were outside.  Seeing that Shullaw was having difficulty standing outside the home after being unhandcuffed, Barbara asked permission for him to come inside and sit with Elizabeth's assistance.  Shullaw was then able to sit down in a chair to recover inside the home.  Hill entered the home with Shullaw and Elizabeth; once Hill was in the home, he appeared to Shullaw to call in the serial number of the gun after retrieving it from the shelf.  Barbara also recalled that McMullen subsequently spoke to someone over walkie-talkie regarding the gun, and Hill saying the gun was "clean."

---

[12] The Deputies offer no explanation for why they did not retrieve and secure the firearm sooner.

The Deputies do not dispute that they ran the serial number of the gun to see if it was stolen; after verifying it was not stolen, they left the gun with the Shullaws.

McMullen testified that he also conducted a search of the home based on exigent circumstances for "an endangered missing child inside this house," but he did not conduct a full search once his concerns were alleviated by Barbara. *See* ECF No. 23-2 at 57:1–18; 63:15–64:22.[13]  Barbara testified that she saw McMullen walk past her into the master bedroom, and then he came back out "real fast."  ECF No. 23-8 at 34:3–7.  Similarly, McMullen recalled that he "did not conduct a full search of the house, but" could not "remember if [he] went into one room or two before Ms. Shullaw dispelled [his] alarm."  ECF No. 23-2 at 57:18–25.

Because Shullaw complained of an injury, the Deputies requested EMS and an ECSO supervisor come to the home.  At 10:45 pm (i.e., about 13 minutes after the Deputies' arrival), supervisor Sgt. Curtis Cephas arrived at the scene and spoke with Shullaw, who was sitting in a chair in the home's computer room.  Cephas prepared a "Blue Team" or "use of force" report in response.  After speaking with Shullaw, Cephas departed the residence around 11:16 pm.

---

[13] The record is not clear exactly when the search took place during the conversation between Barbara and McMullen.  Barbara indicated that it occurred after Shullaw was taken out of handcuffs and the Deputies started to run the serial number of the gun; Shullaw agreed the search occurred after his handcuffs were removed.  McMullen's testimony is not clear on timing; he stated that this was an "exigency" search after some initial discussion with Barbara but "before we've gotten into conversation."  ECF No. 23-2 at 57:1–25.

At 10:59 pm, EMS arrived at the residence.  When EMS spoke with Shullaw, he said that his back and shoulder were injured.   Shullaw ultimately declined further treatment from EMS, and they departed by 11:05 pm.   Following EMS's visit, Shullaw went to the back porch of the residence, where he met with Brittany Bishop of Escambia County Crime Scene who had arrived on scene around 11:23 pm. Bishop photographed Shullaw, including his arm that he said was injured.  Bishop, McMullen, and Hill each departed the Shullaw residence around 11:32 or 11:33 pm. No charges were filed against Shullaw.  Shullaw asserts he experienced a rotator cuff tear and low back injury as a result of the incident that required surgery.

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008).  Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995).  An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Reeves v.*

*C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc).  The Court will not make credibility determinations or weigh the evidence presented on summary judgment.  *Frederick v. Sprint/United Mgm't Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).  Whenever sufficient, competent evidence is present to support the non-moving party's version of the disputed facts, the Court will resolve disputes in the non-moving party's favor.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002).

The Deputies move for summary judgment on all of Plaintiff's remaining claims[14] on qualified immunity grounds.  The Court disagrees that qualified immunity is appropriate on summary judgment.  Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To be entitled to qualified immunity, the government official must first show that he was "engaged in a 'discretionary function' when" the alleged constitutional violation occurred.  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing *Harlow*, 457

---

[14] Counts 7 and 8 were previously dismissed at the pleadings stage.  *See* ECF No. 19 at 11. The remaining claims are Fourth Amendment – Excessive Force by McMullen; Fourth Amendment False Arrest by Hill; Fourth Amendment False Arrest by McMullen; Fourth Amendment Failure to Intervene as to McMullen's Use of Force by Hill; Fourth Amendment Unreasonable Search and Seizure by Hill; and Fourth Amendment Unreasonable Search and Seizure by McMullen.  *See* ECF No. 7.

U.S. at 818).  Once this is established, the burden shifts to the plaintiff to show that qualified immunity would be inappropriate.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  To overcome qualified immunity, the plaintiff must show that the government official violated the plaintiff's constitutional right and that the right violated was clearly established at the time of the alleged misconduct.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  If no constitutional right was violated, the officer is entitled to qualified immunity.  *See Lee*, 284 F.3d at 1194.  If the facts establish a constitutional violation, the plaintiff must also show that the constitutional right involved was "clearly established" at the time of the violation.  *Id.*  This standard is met only where "every objectively reasonable police officer would have realized the acts" were unconstitutional.  *See Garrett v. Athens–Clarke County, Ga.*, 378 F.3d 1274, 1278–79 (11th Cir. 2004).  "It is not necessary for the 'very action in question' to have been previously 'held unlawful,' but the 'unlawfulness must be apparent.'"  *Cohen v. Hill*, No. 2:21-CV-01361-LSC, 2024 WL 4363154, at *6 (N.D. Ala. Sept. 30, 2024) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  If the constitutional right was not clearly established, then the officer is entitled to qualified immunity.

Because the Deputies were engaged in a discretionary function—a welfare check—during the relevant events, the burden is with Shullaw to show that the Deputies violated his clearly established constitutional rights.  *See Lee*, 284 F.3d at

1194; *Ermini v. Scott*, 249 F. Supp. 3d 1253, 1266 (M.D. Fla. 2017) (finding that the "deputies were acting well within their discretionary authority" by "conduct[ing] a welfare check" after arriving at the residence).  To this end, Shullaw argues that the Deputies did not have a legal basis for entering the Shullaws' property; they falsely arrested and seized Shullaw; detained and entered Shullaw's home without exigent circumstances; and used excessive force—all of which purportedly violated Shullaw's clearly established Fourth Amendment rights.  ECF No. 29 at 9–10.  At the very least, Plaintiff argues there are several material facts in dispute, precluding qualified immunity.  *Id.* at 2–3.

## A. Violation of Constitutional Rights due to Improper Basis for Entry and Initial "Seizure"

Shullaw argues that the Deputies "had no legal basis to go to Mr. Shullaw's home and bang violently on his door in the middle of the night," and, by doing so, they violated Shullaw's "clearly established rights to not be searched, seized, arrested, and attacked."  ECF No. 29 at 13.  In support, Shullaw states that the call from David Smith was "anonymous," no crime was reported, and the Deputies failed to verify the existence of a missing person report, contrary to statutorily mandated law under Fla. Stat. 937.021(3).  Shullaw further asserts that he was illegally "seized" under the Fourth Amendment because he would not have felt free to ignore the Deputies under the circumstances.

The Court disagrees. This argument does not implicate the Fourth Amendment on the facts presented. The call was not anonymous.[15] And Shullaw's argument about statutorily mandated verification of a report before investigation does not align with the cited statute which, on its face, does not bar investigation by police before verifying a report.[16] In any event, "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision"—"unless that statute or regulation

---

[15] Smith at least provided his name and number, and appears to have described C.S. as "his child." *See* ECF No. 23-3 at 1–3. And the "random address" to which he directed the police, ECF No. 29 at 4, was that of his former family-in-law.

[16] Instead, Section 937.021(3) mandates:

> A report that a child or adult is missing must be accepted by and filed with the law enforcement agency having jurisdiction in the county or municipality in which the child or adult was last seen. The filing and acceptance of the report imposes the duties specified in this section upon the law enforcement agency receiving the report. This subsection does not preclude a law enforcement agency from accepting a missing child or missing adult report when agency jurisdiction cannot be determined.

Fla. Stat. Ann. § 937.021(3). The statutory text elsewhere does require the adoption of policies for accepting missing child and adult reports and proceeding with investigation. *See* Fla. Stat. Ann. § 937.021(1). Shullaw vaguely gestures at the Deputies violating the "Investigations – Missing Persons" policy of the Escambia County Sheriff's Office. *See* ECF No. 29 at 14 ("[T]he officers were required to have known that acting on a whim rather than following their department policy and state law regarding missing persons was illegal. . . ."); *id.* at 5, 15 ("[T]he Florida statutes, and ECSO policy, require verification" of things, like the child being missing). But it is unclear to the Court that any such violation occurred upon review of the policy itself, *see generally* ECF No. 23-5, and a policy violation does not *per se* establish a constitutional violation, either. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984).

provides the basis for the cause of action sued upon," which is inapplicable here. *Davis v. Scherer*, 468 U.S. 183, 194 & n.12 (1984).

More to the point, Shullaw's arguments ignore the wealth of case law providing a "knock and talk" exception to the Fourth Amendment's warrant requirement. Under that exception, "[t]he Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is ***not*** implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (emphasis added) (concluding a "knock and talk" based on a call for a welfare check is "legitimate police business" and not prohibited by the Fourth Amendment). Moreover, several courts, including in this circuit, have concluded that law enforcement does not require reasonable suspicion of criminal activity for the knock and talk exception to apply. *See, e.g.*, *Taylor v. Nocco*, No. 8:21-CV-555-SDM-CPT, 2024 WL 3678322, at *22 (M.D. Fla. Mar. 24, 2024) (collecting cases).

Here, the Defendants' initial entry onto the Shullaws' property was for this kind of knock and talk to check on the potential welfare of C.S. at that address. *See* ECF No. 23-2 at 37:18–38:1, 50:19–52:8. While the timing of the knock and talk may impact its reasonableness, the totality of the circumstances here do not support a constitutional violation: it was not terribly late in the evening, the Shullaws' porch

light was on, and the dispatch call had just been received.[17]  Despite Shullaw's arguments otherwise, there was no requirement that these Deputies objectively hold a "suspicion of criminal activity associated with" Smith's report.  In sum, nothing about the initial entry onto the property violated Shullaw's the Fourth Amendment rights.

## B. False Arrest and Unreasonable Seizure

Shullaw has further complained that the Deputies, without probable cause, falsely arrested and unreasonably seized him during their encounter once he opened the door to the home.  Shullaw argues that the Deputies' use of excessive force in physically engaging with him after the door was open and his firearm was on the ground was an unlawful arrest, for which the Deputies must have had probable cause under the Fourth Amendment.  In their summary judgment motion, the Deputies assert that Shullaw was detained and, therefore, seized under the Fourth Amendment, but never arrested.  *See also Terry v. Ohio*, 392 U.S. 1, 16 (1968)

---

[17] Plaintiff has cited to the out-of-circuit *Jerez* case in support of his contention that the lateness of the arrival was unreasonable.  ECF No. 29 at 19–20.  Still, the *Jerez* dissent points out that there does not appear to be "any case law stating that . . . door-knocking during the night by law enforcement officers [is] *per se* invalid."  *United States v. Jerez*, 108 F.3d 684, 715 (7th Cir. 1997) (Coffey, J., dissenting).  And the Eleventh Circuit in *U.S. v. Walker* found that conducting a knock and talk at 5:04 am was reasonable.  799 F.3d 1361, 1364 (11th Cir. 2015).  Plaintiff also notes that the timing of the knock and talk was particularly unreasonable because it occurred "at the beginning of the COVID lockdown."  ECF No. 29 at 18.  But Shullaw does not cite any authority, nor has the Court found any, weighing how COVID-19 would impact the "knock and talk" exception.

("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").  Defendants further argue that this detention was a proper seizure that should be analyzed under the reasonable suspicion standard for an investigatory stop of limited duration articulated in *Terry v. Ohio*—i.e., a "*Terry* stop"[18]—rather than the probable cause standard.  *See* ECF No. 24 at 36–37. A *Terry* stop involves a seizure that "lack[s] the essential attributes of full, custodial arrests."  *Croom v. Balkwill*, 645 F.3d 1240, 1246 (11th Cir. 2011).  Even when viewed as a *Terry* stop rather than an arrest, as the Deputies argue,[19] qualified immunity is not appropriate in this case on summary judgment because, viewing the evidence in the light most favorable to Shullaw, the Deputies' conduct exceeded what is reasonable in scope for the stop.

---

[18] "The rationale for permitting brief, warrantless seizures is . . . that it is impractical to demand strict compliance with the Fourth Amendment's ordinary probable-cause requirement in the face of ongoing or imminent criminal activity demanding 'swift action predicated upon the on-the-spot observations of the officer on the beat.'"  *United States v. Sokolow*, 490 U.S. 1, 12–13 (1989) (Marshall, J., dissenting) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

[19] "The difference between an investigatory stop of limited duration and a detention that amounts to an arrest 'is one of extent, with the line of demarcation resulting from the weighing of a limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety.'"  *Bryan v. Spillman*, 217 F. App'x 882, 885 (11th Cir. 2007) (quoting *United States v. Acosta*, 363 F.3d 1141, 1145–46 (11th Cir. 2004)). The Eleventh Circuit applies four non-exclusive factors "in drawing the line between a *Terry* stop and an arrest in an individual case" under the totality of the circumstances: 1) "the law enforcement purposes served by the detention," 2) "the diligence with which the police pursue the investigation," 3) "the scope and intrusiveness of the detention," and 4) "the duration of the detention."  *Acosta*, 363 F.3d at 1146 (quoting *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000)).

Under a *Terry* analysis, to justify an investigatory detention, "the officer's action [must be] justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. at 19–20. Brief investigatory stops do not rise to an unreasonable seizure when the officer has a reasonable suspicion that "criminal activity may be afoot." *Id.* at 30. A reasonable suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27; *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000).[20] In the qualified immunity context, arguable reasonable suspicion will do, however. *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop."). And an officer does not lose his entitlement to qualified immunity where he "reasonably but mistakenly concludes that reasonable suspicion is present." *Id.* at 1165–66. Here, the Deputies' knock and talk escalated to a *Terry* stop as the Deputies drew their weapons and directed Shullaw's movements. At the inception of their encounter, the Deputies had arguable reasonable suspicion that

---

[20] "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)) (internal marks omitted).

they might be in danger and Shullaw had engaged, or was about to engage, in a crime, considering all the circumstances: the call from an identified person, David Smith, regarding an out-of-state missing child, alongside the racking of a gun, which the Deputies could hear through the closed door.

Turning to whether the detention was reasonably related in scope to the circumstances which justified the interference, the Court considers that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). The Deputies had reasonable safety concerns to necessitate arming themselves and immediately commanding Shullaw to disarm once he opened the door with a gun. While the mere presence of a gun may not be enough to engender the belief in an officer that someone is dangerous, on hearing the sound of racking a weapon, making it "available for ready use," "an officer is 'not required to wait and hope for the best.'" *Powell v. Snook*, 25 F.4th 912, 922 (11th Cir.), *cert. denied*, 143 S. Ct. 110 (2022) (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010)).[21]  But here the safety calculus necessarily changed after Shullaw complied

---

[21] *See also Young v. Borders*, No. 5:13-CV-113-OC-22PRL, 2014 WL 11444072, at *16 (M.D. Fla. Sept. 18, 2014), *aff'd*, 620 F. App'x 889 (11th Cir. 2015) (when non-suspect opened

and placed his gun on the ground.  Construing the record in Shullaw's favor, his compliance removed the Deputies' safety concerns.  Shullaw did place the gun on the floor and slid it away.  He also complied by moving toward the threshold of the home where he lowered to his hands and knees on the front step.  The Deputies have not identified any further conduct that presented a safety threat after Shullaw abandoned the weapon.  Moreover, in the absence of a ready-to-use gun, there was no other reasonable suspicion, or even arguable suspicion, that Shullaw had committed a crime based on Smith's request for a welfare check for his missing child, as conveyed to the Deputies by dispatch.  While McMullen and Hill testified that this was a potential kidnapping of the missing child, those conclusions were based on speculation.[22]  On these facts, no objectively reasonable officer could have believed that jumping on Shullaw's back to hold him down and handcuff him after the weapon was removed, and Shullaw was on his knees, was within the scope of effecting a welfare check and ensuring officer safety.  The threat had already been

---

door with gun pointed down, "it was not unreasonable for [officer] to believe that his life was in danger in the instant the door opened and to immediately take action in self-defense").

[22] *See* ECF No. 23-2 at 28:2–14 (McMullen testifying: "The word kidnapping was not used by the complainant as far as I'm aware.  However, this case came out of Missouri, which obviously is several states away and involves an eight year old. . . . Now, this is simply my inference based on the information that I had at the time.  But kidnapping seemed a lot more like a likely scenario the moment that we showed up at this address to verify what's going on and immediately were confronted by the sound of a handgun being charged."); ECF No. 23-1 at 32:6–14 ("[W]e didn't know what we had, so we don't know if this guy actually has a child that's inside kidnapped, a child that's inside that is being injured or hurt in some kind of way.").

diffused.  *Cf. Jessup v. Miami-Dade Cnty.*, 440 F. App'x 689, 694 (11th Cir. 2011) ("Even if we assume that the officers initially had reasonable suspicion to stop [detainees], once they learned that no [item] had actually been stolen, there was no further basis for suspecting any criminal activity and, thus, no lawful reason to continue any detention."); *Croom*, 645 F.3d at 1251 n.15 (during "a traditional *Terry* investigative stop," "detention . . . required to cease once law enforcement's reasonable, articulable suspicions . . . were allayed").

The Court's conclusion is also supported by the location of Shullaw's seizure. As with a warrantless arrest, "in the absence of exigent circumstances, the government may not conduct the equivalent of a *Terry* stop inside a person's home." *Moore v. Pederson*, 806 F.3d 1036, 1039 (11th Cir. 2015); *see also Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Bailey v. Swindell*, 89 F.4th 1324, 1331 (11th Cir.) (stating the "right to be free from a warrantless arrest in [the] home absent exigent circumstances [i]s clearly established"), *cert. denied*, 145 S. Ct. 162 (2024). Moreover, in the context of arrest, if the police have forced the person out of his house by coercion, an arrest is considered to have occurred within the home.  *See United States v. Burch*, 838 F. Supp. 2d 1369, 1373–74 & n.1 (S.D. Ga. 2011), *aff'd*, 466 F. App'x 772 (11th Cir. 2012).

On review of the record, the Court concludes that there is a material question of fact stemming from the location of Shullaw's seizure.  Even accepting Shullaw's account of his physical restraint, the record is vague about whether McMullen crossed into the home or pulled Shullaw from inside the home.  Some testimony from Shullaw indicates he was inside the home, at least partially, when McMullen jumped or pulled on him.  *See* ECF No. 23-7 at 62:10–15 (Shullaw testified that the force of the jump pushed him "[i]nside," "into the house."); *id.* at 63:1–10 (his "right arm and leg were outside" the house while his left arm and leg were inside, and his "body was on the small doorstep"); *id.* at 63:10–14 (Once McMullen "fell off" of Shullaw (in an unknown direction) after the first jump, McMullen "pulled [Shullaw] outside" "to where [he] was off of that step."); *but see id.* at 62:16–20 (When asked if McMullen was inside the house as well, Shullaw said he thought they were "more in the door frame," but "didn't think [McMullen] was in the house at the time."). Without more, Shullaw's testimony does not make clear where the detention occurred, and this question of fact is material to Shullaw's Fourth Amendment claims.  *See Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much"); *see also McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007) ("Because Deputy . . . physically hauled [resident] out of his home, the arrest was unlawful.").

There were also coercive tactics to induce Shullaw to leave his home when the officers unholstered, drew their guns on Shullaw, and—after Shullaw disarmed himself—shouted for him to leave the home.    Accordingly, the officers here commanded Shullaw to exit his home and acted with such authority that Shullaw reasonably believed he had to comply.  *See Burch*, 838 F. Supp. 2d at 1373; *see also Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 524 (11th Cir. 2019) (stating, in Fourth Amendment context, "[a] choice in which the answer is dictated by coercion is no choice at all").  And he did.  Thus, even in the absence of a question of fact, Shullaw appears to have been seized in his home constructively.  Assuming that Shullaw was detained in his home, Shullaw's manner of detention could only be justified if exigent circumstances permitted it.    "The exigency umbrella 'encompasses several common situations where resort[ing] to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit.'"  *United States v. Cooks*, 920 F.3d 735, 741–42 (11th Cir. 2019) (citing *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002)).  The mere possession of a gun does not give rise to exigent circumstances.  *See O'Kelley v. Craig*, 781 F. App'x 888, 896–97 (11th Cir. 2019).  Likewise, acting "generally uncooperative" in "a fraught situation," including by refusing to put down a gun, "does not show an '*urgent* need for *immediate* action.'"  *Id.* at 897 (citation omitted).

The Court cannot find as a matter of law that exigent circumstances existed after Shullaw disarmed himself and the Deputies carried through with Shullaw's detention on the ground.  *See O'Kelley v. Curran*, No. 22-10600, 2023 WL 2889246, at *9 (11th Cir. Apr. 11, 2023), *cert. dismissed,* 144 S. Ct. 444, 217 L. Ed. 2d 387 (2024) ("[T]ime is an essential factor when an *immediate* threat forms the basis for police claims of exigency. . . . [E]xigent circumstances terminate when the factors creating the exigency are negated." (quoting *Carlson v. Fewins*, 801 F.3d 668, 674 (6th Cir. 2015)) (second alteration in original)).

The Court is mindful that the facts at trial may not be the same as the summary judgment record, and that the jury will be free to draw inferences and make credibility calls—but on the undisputed circumstances presented on this summary judgment record regarding Shullaw's detention, the Deputies are not entitled to qualified immunity.

## C. Unlawful Search

Shullaw has also asserted claims for an unlawful search of his home against both Deputies.  Shullaw contends that the Deputies "had no legal basis" to search the home.  ECF No. 29 at 21.  It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton*, 445 U.S. at 586) (internal marks omitted).  However, the exigent circumstances doctrine

noted above extends to warrantless searches as well, and the Deputies contend that any search fell under this exception to the warrant requirement.  ECF No. 24 at 41.[23] Specifically, the Deputies argue that the "emergency aid" aspect of the exigent circumstances doctrine applies.  *Id.* at 41–42.  "In order to justify an exigent-circumstances search, the government bears the burden of 'demonstrat[ing] both exigency *and* probable cause.' . . . In the emergency-aid context, 'the probable cause element may be satisfied where officers reasonably believe a person is in danger.'" *Cooks*, 920 F.3d at 742 (quoting *Holloway*, 290 F.3d at 1337–38) (emphasis added); *Purcell v. City of Fort Lauderdale*, No. 21-CV-61006, 2024 WL 4489527, at *9 (S.D. Fla. Oct. 15, 2024) ("[T]he Eleventh Circuit (and many of its sister circuits) have clarified that the 'probable cause element may be satisfied where officers reasonably believe a person is in danger.'" (quoting *Holloway*, 290 F.3d at 1338)).

The Deputies contend that it is "it is reasonable . . . that McMullen and Hill believed that exigent circumstances existed to both enter the home, remove the threat associated with the loaded gun that was still on the floor of the residence, i.e., within ten feet of the front door, and to continue to check to investigate whether or not the

---

[23] There is no argument by Defendants that the officers obtained consent to enter the home. Nevertheless, Shullaw argues that such consent would have been impossible under the circumstances because of the officers' "show of official authority."  ECF No. 29 at 24–25 (quoting *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002)).  Because the Deputies do not argue that the search was by consent, the Court presumes it is not a basis for legal entry here.

reported missing child was in the residence."  ECF No. 24 at 43.  Plaintiff opposes,

arguing no reasonable basis existed for the Deputies to believe "a person was in the

house" or "needed immediate aid."  ECF No. 29 at 22 ("Here, there was no verified

missing person report, there was also no report of any potential or reported harm or

danger, no fact obtained by Defendants to suggest a kidnapping, or crime of any

kind, and no history of mental health or danger to the alleged missing person.").

Accordingly, "[t]he real question here is whether the exigency remained ongoing

during the officers' search of the [home]—in particular, that they could have

reasonably believed that the [space] could have contained someone who was 'in

danger,' . . . or 'in need of immediate aid.'"  *Cooks*, 920 F.3d at 742 (internal citations

omitted); *see also id.* at 743 ("where the exigencies demand it, 'the sanctity of the

home . . . must give way to the sanctity of human life'").

Based on the record and viewing the facts in the light most favorable to

Shullaw, the Court concludes that no reasonable officer could have determined that

there were exigent circumstances to believe a person was in danger (i.e., establish

probable cause) when the Deputies entered the home, and conducted a short search

of the Shullaws' bedroom, in the course of investigation.  The threat had already

dissipated to the point that Shullaw was taken out of handcuffs, and both Deputies

had holstered their weapons, by the time that both the Deputies entered the home

and McMullen conducted his search of the bedroom (when viewing the facts in the

light most favorable to Shullaw).  Shullaw testified that the loaded gun was still on the ground and unsecured after he was unhandcuffed and standing.  The delay between Shullaw dropping the gun and the Deputies' attempts to secure it are at odds with the firearm imposing exigent circumstances.  And, as noted above, there was nothing in the dispatcher's report to say that this was a suspected kidnapping or other criminal threat to the child.[24]  Accordingly, the Deputies are not entitled to qualified immunity for their investigation within the home at this stage.

## D. Excessive Force

Shullaw also makes a claim of excessive force against McMullen.[25] Excessive force is analyzed "under the Fourth Amendment's objective reasonableness standard." *Shaw v. Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018) (citations omitted).  This is true "for *all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other

---

[24] Indeed, it appears that there is a question of fact as to whether Hill himself considered there to be exigent circumstances.  Hill indicated there "would" be exigent circumstances where there is a "missing person" investigation coupled with Shullaw answering the door with a firearm and "refus[ing] [the Deputies'] initial commands to put" the gun down.  ECF No. 23-1 at 69:14–19.  But elsewhere, when asked if there "were [] any exigent circumstances in this incident," he stated the Deputies "didn't know if we had any exigent circumstances."  *Id.* at 56:2–6.

[25] Out of an abundance of caution, the Deputies make the summary judgment motion on behalf of both Deputies as to the excessive force and failure to intervene counts, even though the Amended Complaint only applies those Counts to McMullen or Hill, respectively.  As Shullaw's Amended Complaint and summary judgment opposition briefing indicate that the use of force claim is only applicable to McMullen and the failure to intervene, Hill, the Court will not lump the Deputies together in its analysis.

'seizure' of a free citizen." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Under this standard, courts must examine the facts "from the perspective of a reasonable officer on the scene" and "balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate."[26] *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). "In assessing the 'reasonableness' of the force the officers deployed, [the Court] look[s] to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Foulke v. Weller*, No. 22-13942, 2024 WL 2761778, at *6 (11th Cir. May 29, 2024) (quoting *Graham*, 490 U.S. at 396).

"To determine whether an officer is entitled to qualified immunity in this context, 'the focus should be on whether the law on the date of the excessive conduct in question gave the implicated officials fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Owen v. Sheriff of Okaloosa Cnty.*, No. 3:21CV906-MCR-HTC, 2023 WL 2721647, at *5 (N.D. Fla. Mar. 30, 2023), *appeal dismissed*, No. 23-11456-A, 2023 WL 4771910 (11th Cir. May 12, 2023). By the

---

[26] The Court's analysis must take into account that law enforcement officers are "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Indeed, "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

date of this incident in 2020, it was well-settled that an officer cannot use "gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Richmond v. Badia*, 47 F.4th 1172, 1184 (11th Cir. 2022).

Shullaw argues that the use of force was excessive because there was no need to apply force at all, and "the force used was excessive." ECF No. 29 at 29.[27]  On this record, and for the reasons previously stated, the Court agrees, and summary judgment is denied on this Count.

## E. Failure to Intervene

The final Count challenged on summary judgment is a failure to intervene claim against Hill. "[A]n officer can be liable for failing to intervene when another officer uses excessive force." *Priester v. City of Riviera Beach,* 208 F.3d 919, 924 (11th Cir. 2000).  If McMullen used excessive force when Hill was present, Hill may be liable for failing to intervene. *See Jones v. Cash*, No. 3:21CV487-MCR-HTC, 2022 WL 2820752, at *2 (N.D. Fla. June 13, 2022), *report and recommendation adopted*, 3:21CV487-MCR-HTC, 2022 WL 2818261 (N.D. Fla. July 19, 2022).

---

[27] Shullaw also states that "[b]ecause Defendants had no entitlement to arrest or detain Mr. Shullaw, all of the force was illegal." ECF No. 29 at 29.  To the extent Shullaw asserts that the force used during his detention was excessive because the stop was illegal, this claim "is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000).

Construing the facts in Shullaw's favor, Hill is not entitled to summary judgment based on qualified immunity.

Accordingly, Defendants' motion for summary judgment, ECF No. 24, is **DENIED**.

**DONE and ORDERED** this 31st day of March, 2025.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**